**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COLIN HANN, CAROL GALLAGHER, )<br>and IMPORT LOGISTICS, INC., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>THE PAUL REVERE LIFE INSURANCE )<br>COMPANY and PROVIDENT LIFE AND )<br>ACCIDENT INSURANCE COMPANY )<br>)<br>Defendants. ) | Case No. 03 C 1062<br><br>Magistrate Judge Nan R. Nolan |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Colin Hann ("Hann"), Carol Gallagher ("Gallagher"), and Import Logistics, Inc. ("Import Logistics") initiated this lawsuit against Defendants The Paul Revere Life Insurance Company and Provident Life and Accident Insurance Company in order to recover benefits under three disability insurance policies naming Hann as the covered insured. The parties have filed cross-motions for summary judgment on the issue of liability. For the reasons stated below, Plaintiffs' summary judgment motion [#78] is denied and Defendants' summary judgment motion [#79] is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

### A. The Business of Import Logistics

Hann and Gallagher incorporated Import Logistics in 1991. Hann served as President, Gallagher served as Vice President, and they each owed 50% of the company's stock. The business of Import Logistics is to establish a domestic supply chain for its clientele of

---

[1] The following facts are undisputed unless indicated otherwise.

approximately thirty overseas manufacturers.  Import Logistics processes the export and import of foreign made products for its clients, maintains an inventory of its clients' products at its Aurora, Illinois warehouse facility, processes purchase orders for the sale of it clients' products and coordinates the logistics for delivering those products to manufacturers located in the United States.  Import Logistics has approximately twenty-five employees in various departments, including accounting, brokerage, warehouse and materials management, and general business administration.

**B.     Hann's Individual Disability Insurance Policy Issued By Paul Revere**

Hann is the named insured under an individual disability insurance policy, Policy No. 0102611795 ("IDI Policy") issued to Hann by Paul Revere on April 1, 1993.  The IDI Policy contains, in relevant part, the following definition of Total Disability:

> "Total Disability" means that because of Injury or Sickness:
> a.   You are unable to perform the important duties of Your Occupation; and
> b.   You are receiving Physician's Care.  We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

The IDI Policy defines "Your Occupation" as "[t]he occupation or occupations in which You are regularly engaged at the time Disability begins."

**C.     The Paul Revere Business Buy-Out Expense Policy**

Hann is the named insured under Policy No. 0102611796 issued by Paul Revere to "Carol Gallagher c/o Import Logistics" as "Owner" with an issue date of April 1, 1993 ("Paul Revere Buy-Out Policy").  The Paul Revere Buy-Out Policy states: "Benefits will be paid to reimburse Buy-Out Expenses incurred to perform the Buy-Sell Agreement." The Paul Revere Buy-Out Policy also states: "The Paul Revere Life Insurance Company will pay the benefits provided in the Policy to reimburse You, the Owner of this Policy, for monies actually paid to

buy the disabled Insured's entire ownership interest in the Business Entity." The Paul Revere Buy-Out Policy defines "Buy-Sell Agreement," "Buy-Out Expense" and "Business Entity," respectively, as follows:

> "Buy-Sell Agreement" means a written agreement between the insured and You [*i.e.*, the "Owner"]. It calls for the purchase of the Insured's entire ownership interest in the Business Entity in the event of the Insured's Total Disability. We [Paul Revere] are not a party to this agreement.
>
> "Buy-Out Expense" means the monies payable by You to the Insured to perform the terms of the Buy-Sell Agreement in effect when the Insured's Total Disability began.
>
> "Business Entity" means the partnership or corporation named in the Application in which the Insured has an ownership interest. It also means the same business with the same ownership under a new name.

The Business Entity named in the Application is Import Logistics.

> The Paul Revere Buy-Out Policy defines Total Disability, in relevant part, as follows:
>
> "Total Disability" means that because of Injury or Sickness the insured:
> a. Is unable to perform the important duties of his or her regular occupation; and
> b. Does not perform any work for the Business entity.
> c. Is Receiving Physician's Care.

The Paul Review Buy-Out Policy provides in section 2.1 titled Conditions of Payments, as follows:

> The Buy-Out Expense benefit will become payable as of the later of: a) the Commencement Date; or b) the date a Buy-Out Expense is incurred. The Policy must be in force when the Insured becomes Totally Disabled. A Buy-Sell Agreement must be in effect when Total Disability begins.

The maximum Business Buy-Out Expense benefit under the Paul Revere Buy-Out Policy is $250,000.00.

**D.     The Provident Business Buy-Out Expense Policy**

Hann is the named insured under Policy No. 06-1738-6146953 issued by Provident to Import Logistics as "Policy Owner" with an issue date of February 18, 2000 ("Provident Buy-Out Policy").  The Provident Buy-Out Policy states: "A Business Buy-Out Expense Disability Policy provides funds toward the purchase of a disabled Insured's ownership interest in a business."  The Provident Buy-Out Policy provides, in the section titled Total Disability - Single Lump Sum Funding Method as follows:

> We will pay a lump sum benefit to the Loss Payee for the Business Buy-Out Expense if: (a) the Insured is an owner of the Business and is engaged in Active Full-time Work when the Period of Disability starts; and (b) a lump sum becomes payable in accordance with the Buy-Sell Agreement because of the Insured's Total Disability.

The Provident Buy-Out Policy names the Loss Payee as Carol Gallagher.

> The Provident Buy-Out Policy defines "Total Disability," in relevant part, as follows:
>
> Total Disability and totally disabled means that due to Injuries or Sickness, the Insured:
>
> 1.     is not able to perform the substantial and material duties of his/her occupation; and
>
> 2.     is receiving care by a Physician which is appropriate for the condition causing the disability.  We will waive this requirement when continued care would be of no benefit to the Insured.

The Provident Buy-Out Policy defines "Buy-Sell Agreement" and "Business Buy-Out Expense," respectively, as follows:

> The Buy-Sell Agreement means a written agreement between Business and/or its Principals and the Insured.  It must provide for the purchase of the Insured's ownership interest in the Business due to his/her Total Disability.  We are not a party to this agreement.
>
> Business Buy-Out Expense means any money paid by or through the Loss Payee to the Insured in performance of the terms of the Buy-Sell Agreement because of Total Disability of the Insured.

The Application for Business Buy-Out Expense Disability Insurance, which is attached to the policy, states that it "is understood that a requirement for the payment of policy benefits is that a written agreement must be in effect between the Business and/or Its Principals and the insured covering the purchase of the Insured's ownership interest in the Business because of Total Disability of the Insured." The maximum Business Buy-Out Expense benefit under the Provident Buy-Out Policy is $250,000.00. The Provident Buy-Out Policy provides for an aggregate benefit increase to $267,500.00, provided the insured's disability starts after March 1, 2001, which is the effective date of the benefit increase.

**E.     Hann's Total Disability Claim**

In January 2000, Hann experienced bilateral hearing loss, which his family physician, Dr. Jay Seymour, treated with decongestants. Dr. Seymour referred Hann to Dr. Stuart Morgenstein, an otolaryngologist, who obtained an audiogram on March 25, 2000. Dr. Morgenstein opined that Hann had moderate to severe hearing loss, with poor word recognition in the right ear, and good word recognition in the left ear at elevated levels. Dr. Morgenstein determined that Hann was an "excellent hearing aid candidate."

A few months after sustaining bilateral hearing loss in January 2000, Hann's hearing improved. On March 15, 2000, Dr. Seymour noted that Hann's "hearing has improved significantly but still is not where he would like [it] to be." In late October 2000, Hann sustained a second occurrence of bilateral hearing loss. During the period from May 2000 to October 2000, Hann was able to resume his normal occupational duties as President of Import Logistics.[2]

---

[2] Defendants move to strike the affidavit of Dr. Robert A. Battista, one of Hann's treating physicians, because it is undated and not signed by a notary or other person authorized to administer an oath. Hann did not seek to correct the deficiencies identified by

On May 25, 2001, Hann submitted a disability claim form to Paul Revere and Provident, in which he claimed to be totally disabled due to hearing loss since January 10, 2000. On his disability claim form, Hann identified his occupation as President of Import Logistics, and listed his occupational duties as "customer relations," "new business development," and "general management." Hann described how his hearing loss interfered with the performance of his occupational duties as follows: "Degree of hearing loss (aided) makes conversational word discrimination very difficult. Telephone use without speaker phone is not possible." Defendants denied all of Hann's claims under the three Policies.

In discovery, Hann described his alleged disabling condition as follows:

> Plaintiff suffers from moderate to profound bilateral sensorineural hearing loss which has resulted in incredible difficulty understanding and participating in verbal communication. As a result of Plaintiff's substantial hearing loss, word discrimination is extremely difficult during in person communication and telephonic communication is impossible without a speaker phone that is equipped with certain frequency capabilities and even then it is incredibly difficult. Additionally, because of the extreme damage to Plaintiff's inner ear he is unable to hear without distortion and extreme difficulty even with the aid of full-time state-of-the-art hearing instruments in each ear.

---

defendants. Dr. Battista's unsworn filing is not an affidavit because it is not notarized. Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985) (stating "'[a]n affidavit is a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath."). Nor does Dr. Battista's filing qualify as a declaration pursuant to 28 U.S.C. § 1746 because it was not executed under penalty of perjury. 28 U.S.C. § 1746 permits an unsworn declaration to substitute for an affidavit only if executed "under penalty of perjury." Dr. Battista's filing is stricken. See Gilty v. Village of Oak Park, 919 F.2d 1247, 1255 n.13 (7th Cir. 1990) (explaining that statements that are "neither notarized nor made under penalty of perjury [do] not comply with Rule 56(e) . . . . As such, we can simply ignore them.").

Defendants further move to strike the letters of Dr. Richard J. Wiet, another treating physician, submitted in support of Hann's disability claim as inadmissible. Hann did not seek to cure Dr. Wiet's unsworn statements. Wiet's unsworn letters are inadmissible and are stricken. Capobianco v. City of New York, 422 F.3d 47, 55 (2d Cir. 2005) (stating "[a]s a general matter, it is correct that unsworn letters from physicians generally are inadmissible hearsay that are insufficient basis for opposing a motion for summary judgment.").

Hann further described the assistive listening devices utilized by him as follows:

> Plaintiff utilizes state-of-the-art quality digital hearing instruments in each ear full-time. Additionally, Plaintiff can use a telephone that is equipped with a particular vocal frequency, however, he must place his ear over the speaker portion of the phone to hear any conversation. Plaintiff has been informed by his medical care givers that a surgical option exists called a "cochlear implant" in order to stimulate the hearing nerve fibers. However, at this time, Plaintiff has not chosen to undertake this procedure as its results in a 100% loss of hearing if unsuccessful.

Hann testified that he has been able to experience some degree of hearing with the use of hearing aids and his ability to hear with hearing aids has been essentially the same or stable since October 2000. Hann Dep. at 17-18. Hann further testified that his ability to hear with hearing aids fluctuates daily with some days being better than others. Id. at 18.

**F.    Hann's Occupational Duties as President of Import Logistics**

As President of Import Logistics, Hann supervised and continues to supervise the company's corporate affairs. By letter dated February 4, 2002, Hann submitted a list of what he believed were the important aspects of his role at Import Logistics prior to the onset of his hearing loss in January 2000. Set forth below is Hann's list:

Rainmaker (# indicates annual frequency)
| | |
|---|---|
| 4-6 | Overseas trips. Western Europe, Australia, N.Z. |
| 3 | Trade shows. Detroit, Las Vegas, Chicago. (Automotive o.e.m., automatovie aftermarket and housewares) |
| 3-4 | Miscellaneous domestic conferences, seminars. |
| 70-100 | Client visits to our offices. |
| 15-20 | Prospective client visits to our offices. |
| 4-5 | Domestic presentations off-site (out of state) |

Supporting desk research/planning/preparation for above
Office based networking/communication to maintain above
All related contract negotiations

Administrative (external)
Manage banking, legal and insurance needs/relationships
Manage foreign freight forwarding, brokerage and steamship company relationship/policies

<u>Administrative (internal)</u>
Communicate strategic needs and ensure they meet timing, service and cost requirements of clients and budgetary limitations of Import Logistics

In discovery, Hann identified his occupation as "President of Import Logistics, Inc." Hann described the important and material and substantial duties of his occupation prior to the onset of his hearing loss as follows:

- working as an ambassador of customer relations, initiating and developing new business relationships and general management duties;

- with respect to current clients, monitoring and maintaining business relationships with decision-making personnel through phone calls and in-person meetings which required frequent overseas travel;

- with respect to potential clientele, frequent telephone communication, in-person visits and oral presentations which frequently required overseas travel;

- as the general manager of Import Logistics, monitoring the company's finances, internal and external administrative matters, including banking, procuring insurance, and maintaining supplier relations;

- customer relations 20+ hours per week; new business development 20+ hours per week; general management 10+ hours per week;

- plaintiff's annual salary was approximately $125,000; however, this amount is not severable as it is compensation for all duties as president

During discovery, Hann identified the following personal and/or business travel undertaken by him since 1988:

1999:  January – 10 days; Great Britain; unaccompanied
March – 15 days; New Zealand & Australia; unaccompanied
August – 16 days; Great Britain, France, Germany, Italy; unaccompanied
September – 10 days; Great Britain; unaccompanied
December – 14 days; Great Britain & Germany; unaccompanied

2000:  June – 12 days; Great Britain & Switzerland; unaccompanied
October - 12 days; Great Britain, France & Italy; unaccompanied

> 2001: March – 12 days; Great Britain, Germany, Italy; accompanied by Gallagher
> June - 14 days; Great Britain, France, Italy; accompanied by Carol Gallagher
>
> 2002: None

No one at Import Logistics engaged in business-related overseas travel between 2002 and 2005.

Since October 2000, Hann has continued to possess supervisory authority over all employees of Import Logistics. Hann has also continued to study the company's operational productivity, including participating in the design of new storage equipment to improve the company's efficiency, to study new work methods and technology to increase the productivity of the company's shipping and custom brokerage business, to participate in decisions to improve the company's operations, to review trade literature and study the operations of competitors, and to analyze internal financial reports, in order to address the company's profitability and evaluate the efficiency of the services provided to customers. Hann denies that these are important or substantial and material duties of his pre-hearing loss occupation.

Hann admitted that he continues to be a part of the delegation of Import Logistics personnel that meet with approximately 100 clients per year at Import Logistics' corporate offices. The extent of Hann's participation in such client meetings is unclear on the current record. Hann testified that he continues to interrelate with clients in-person "[t]o the extent that [he's] able." Hann Dep. at 42. Since October 2000, Hann has continued to communicate with clients by email on a daily basis. Hann acknowledged that email communication is a very common means of communication in his industry. Hann further testified that person-to-person communication is a valuable means of communication in the sales part of his industry. Hann Dep. at 59.

As Vice President of Import Logistics, Gallagher focused primarily on the operation details of the company. She communicated with the company's manufacturing clients to understand their objectives, created a logistics plan that fulfilled the client's needs, and implemented the logistics plan. After the onset of Hann's hearing loss, Gallagher has taken over duties that were previously Hann's duties, including taking exclusive responsibility for a variety of decision making matters related to the build-out of a new building, attending meetings on Hann's behalf, and communicating directly with clients regarding needs or requests. Gallagher's Dep. at 45-48. Effective December 30, 2005, Hann, acting as President, executed a Stock Redemption Agreement with Gallagher by which Import Logistics redeemed all of Gallagher's stock in the company. Effective December 30, 2005, Hann became the sole shareholder of Import Logistics. In 2006, after Gallagher's departure, Hann hired Maxwell Lewis as Vice President of Sales and Marketing.

## DISCUSSION

Federal Rule of Civil Procedure 56 states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In considering cross-motions for summary judgment, we are obligated to view all facts and draw all reasonable inferences in a light most favorable to the party against whom the motion under consideration is made." Gazarkiewicz v. Town of Kingsford Heights, 359 F.3d 933, 939 (7th

Cir. 2004). "A party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Id. at 256.

**A.   Total Disability**

In order to obtain benefits under the individual disability policy and the two business buy-out expense policies, Hann must establish that he is totally disabled. The parties agree that Illinois law controls this determination. Hann is totally disabled under the IDI Policy if he is "unable to perform the important duties of [his] Occupation." The Paul Revere Buy-Out Policy defines "total disability" as, among other things, the insured being "unable to perform the important duties of his or her regular occupation." A person is totally disabled under the Provident Buy-Out Policy if he is "not able to perform the substantial and material duties of his/her occupation." The parties use the terms "important" and "substantial and material" interchangeably.

In McFarland v. General American Life Ins. Co., 149 F.3d 583 (7th Cir. 1998), the Seventh Circuit examined similar policy language under Illinois law. Mr. McFarland was the owner, operator, and president of a small heating and air conditioning company. He injured his left knee and suffered a hernia. It was undisputed that Mr. McFarland was able to perform only 35% of his former duties. Id. at 588. The policy in McFarland was triggered if the insured was "unable to perform the material and substantial duties of [his] regulation occupation." Id. at 586. The purpose of the policy was to "protect[] the insured from disabilities that prevent his continuing in his regular occupation." Id. at 587. The Seventh Circuit found it clear that the insured would be totally disabled within the meaning of the policy "[w]hen the insured cannot perform a sufficient number of his material and substantial

duties and is therefore precluded from continuing the employment he took before the disability . . . ." Id. The court stated:

> [T]he language of the policy does not render the insured ineligible for coverage under the occupational disability coverage simply because he can perform several functions that are "material and substantial." Rather, coverage is present as long as the number of "substantial and material" duties that cannot be performed precludes continuation of employment in the position held before the disability. Nor do we believe that the policy can be read in a principled manner to limit coverage to situations in which there is a formal change in position or title. Rather, we think that the contract, read as a whole, requires coverage whenever there is a substantial change in the responsibilities, terms or conditions of one's occupation.

Id. at 587-88.

The McFarland court recognized two "broad categories of disability that might require a determination of total disability under the Great American policy." Id. at 588. Specifically, "[t]he policy language could be interpreted reasonably to cover both qualitative and quantitative reduction in one's performance as a result of an injury or sickness." Id. A qualitative reduction would occur when a person was no longer able to perform one core or essential aspect of his job. Id. For example, if a shortstop, whose principal duties include running, hitting, catching, and throwing, were injured and no longer able to throw, he would be totally disabled because he could no longer perform one core and essential aspect of his job (throwing). Id. "This disability, while affecting only one of several core skills, would be enough to prevent him from continuing to perform as a shortstop." Id. A quantitative performance reduction would be one in which the injury or sickness "renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working in his regular occupation." Id. The Seventh Circuit remanded Mr. McFarland's case because the court could not determine, on the record before it, whether the disruption in Mr. McFarland's occupational activities amounted to an "inability to function as owner and

operator of the corporation as he functioned prior to his disability." Id. Although it was clear that Mr. McFarland had retained his title, it was not clear whether he had "been able to retain the remuneration and authority that he earlier enjoyed." Id.

Defendants argue that there is no dispute that Hann did not sustain a qualitative or quantitative reduction in work capacity due to his hearing loss such that he could no longer perform his core responsibilities as President of Import Logistics. Plaintiffs, on the other hand, contend that Hann is totally disabled under either the qualitative or quantitative analysis. They say Hann's hearing difficulties prevent him from performing the important duties of his occupation as he performed them prior to his hearing loss. Plaintiffs contend that Hann has crafted a new position that embodies some of his former managerial duties.

Applying the analysis in McFarland, the Court first identifies the duties Hann performed as President prior to his hearing loss. As President of Import Logistics, Hann's duties included communicating with existing and potential clients at in-office meetings, via telephone conference, and in various social and business situations. Doc. #92 at ¶ 10. Hann identified the important or material and substantial duties that he performed as President prior to his hearing loss as falling into three main categories: (1) ambassador of customer relations; (2) initiating and developing new business relationships; and (3) general management duties. With respect to current clients, Hann's duties included monitoring and maintaining business relationships with decisionmaking personnel through phone calls and in-person meetings which required overseas travel. Prior to the onset of his hearing loss, Hann's duties with respect to new business development included frequent telephone communication, in-person visits, and oral presentations which required overseas travel. Hann's general management duties prior to the onset of his hearing loss involved monitoring

the company's finances and handling internal and external administrative matters involving banking, procuring insurance, and maintaining supplier relations. Prior to his hearing loss, Hann spent 20+ hours per week maintaining customer relations, 20+ hours per week developing new business, and 10+ hours per week handling general management duties. Sondra Padow ("Padow"), a vocational rehabilitation counselor retained by Defendants' Debra Eichel, found that Hann's duties as President required frequent (⅓ to ⅔ of the work day) hearing and talking. Pl's Exh. N at 2.

Proceeding with the McFarland analysis, the next issue is whether Hann's hearing loss caused a qualitative or quantitative reduction in capacity such that he could no longer operate as President of his company as he previously functioned. Neither side is entitled to summary judgment on this issue because material facts remain in dispute and a reasonable trier of fact could reach more than one conclusion as to Hann's ability to function as President of Import Logistics as he functioned prior to his hearing loss.

Despite his hearing condition, Hann has retained his title, compensation, and authority as president of Import Logistics. Hann continues to supervise the corporate affairs of Import Logistics by, among other things, supervising all employees, analyzing financial reports and assessing the company's profitability, studying the company's operational productivity, evaluating and improving the efficiency of the services provided to customers, studying network methods and technology to increase the productivity of the company's shipping and customer brokerage business, and studying the operations of his company's competitors.[3] Since claiming to be totally disabled, Hann has also presided over a period of tremendous

---

[3] There has been no showing that these are important or substantial and material duties of Hann's occupation.

growth in the business of Import Logistics and his authority and control over the company actually expanded in December 2005 when he became the sole shareholder of Import Logistics.

The fact that Hann's title, authority, and compensation have not been disrupted since October 2000 does not end the total disability analysis. As the Seventh Circuit determined in McFarland benefits should be paid "whenever there is a substantial change in the responsibilities, terms or conditions of one's occupation." McFarland, 149 F.3d at 588. A determination of total disability, therefore, requires an examination of whether there was a substantial change in Hann's client relations and business development duties.

A reasonable trier of fact could conclude that the disruption in Hann's occupational activities in the areas of client relations and business development amounts to an inability to function as President of Import Logistics as he functioned prior to his hearing loss. Even without Drs. Battista's and Wiet's unsworn statements, the facts show that Hann sustained a bilateral sensorineural hearing loss. Debra E. Eichel, Customer Care Specialist for The Paul Revere Insurance Company and UnumProvident Corporation, described the extent of Hann's hearing loss as "profound" and "substantial" based on her review of the medical information. See Pl's Ex. L. Gallagher, Hann's former business partner, confirmed that Hann has "a lot of hearing loss" and "participates [at work] with difficulty." Gallagher Dep. at 48.

Viewing the evidence and drawing all inferences in the light most favorable to Hann, a reasonable factfinder could find that there has been a significant change in Hann's responsibilities as President of Import Logistics. Hann has presented sufficient evidence that he can no longer communicate with clients and prospective clients by phone or in-person as he functioned prior to his hearing loss. Hann testified: "I used to spend my life on the

telephone." Hann Dep. at 58.  Hann now has great difficulty using the telephone and has been unable to communicate with clients over the telephone since his hearing loss.  Hann's Dep. at 41-42; Gallagher Dep. at 50-51, 70.  Hann admitted that he is generally part of a delegation of persons who meet with clients during their visits to Import Logistics, but issues of fact remain regarding whether Hann is able to participate in on-site client meetings and visits to the same extent as he did prior to his hearing loss.  Hann Dep. at 42; see also Pl's Exh. N at 2 (finding Hann would have difficulty comprehending speech in a noisy restaurant, tradeshow, or group meeting).  Prior to his hearing loss, Hann exclusively handled the role of sales for Import Logistics.  Hann Dep. at 40.  Hann testified that his hearing condition renders him unable to perform sales-related activities for Import Logistics.  Id. at 40-41.  Hann can still communicate with clients via e-mail but Hann testified that in-person communication is valuable in generating sales.  Hann Dep. at 41, 59.  Hann has also not engaged in work-related travel since 2001.  Gallagher confirmed that Hann "has not done any solicitation, such as going to visit anybody."  Gallagher Dep. at 70.  A genuine issue of material fact exists as to the extent of Hann's work-related travel prior to his hearing loss.  Def. Apdx. Ex. H, Hann's Answers to Interrogatories, No. 7; Def. Apdx. Ex. K, February 4, 2002 Letter and Attachment; Gallagher's Dep. at 73.

While it is possible that a reasonable factfinder could find that Hann is able to perform the important or substantial and material duties of his occupation, this conclusion is not mandated by the uncontested facts.  A trier of fact could also reasonably find that Hann is unable to function as President of the Import Logistics as he functioned prior to his hearing loss.  Because more than one conclusion can be drawn, neither side may prevail on summary judgment on the issue of whether Hann is unable to perform the important or

substantial and material duties of his occupation.

**B.    Buy-Sell Agreement**

The next inquiry is whether Plaintiffs satisfy the Buy-Sell Agreement requirement of the Paul Revere Buy-Out Policy and the Provident Buy-Out Policy. The Paul Revere Buy-Out Policy and the Provident Buy-Out Policy unambiguously require the existence of a written Buy-Sell Agreement. Part of the Paul Revere Buy-Out Policy included a condition that "[a] Buy-Sell Agreement must be in effect when Total Disability begins." Under the terms of the Provident Buy-Out Policy there must be a written Buy-Sell Agreement "for the purchase of the Insured's ownership interest in the Business due to his/her Total Disability."

No dispute exists regarding the existence of the required Buy-Sell Agreement. Neither Gallagher nor Import Logistics ever purchased Hann's 50% ownership interest. In fact, effective December 30, 2005, Hann, acting as President, executed a Stock Redemption Agreement with Gallagher by which Import Logistics redeemed all of Gallagher's stock in the company. As a result of the redemption of Gallagher's stock, Hann became the sole shareholder of Import Logistics. Plaintiffs' argument that it is "inequitable and unjust" to require Plaintiffs to comply with the Buy-Sell Agreement requirement when Defendants have denied that Hann is totally disabled is unpersuasive because it is unsupported by any citation to authority or citation to the language of the Buy-Out policies. See Doc. #90 at 10 (arguing that "[i]n light of the unequivocal denial of Hann's total disability claim, executing a buy-out policy would be fruitless leaving Import Logistics/Gallagher without financial recourse after paying for Hann's shares and leaving Hann with no source of income.").

As to Plaintiffs' claims under the Paul Revere Buy-Out Policy and the Provident Buy-Out Policy, there is no genuine issue for trial and Defendants are entitled to judgment as a

matter of law. This makes it unnecessary for the Court to reach Defendants' alternative argument that Plaintiffs can not establish that Hann "[d]oes not perform any work for the Business Entity" as required by the Paul Revere Buy-Out Policy to further satisfy the definition of "Total Disability."

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is granted in part and denied in part. This case is set for a status hearing on August 21, 2008 at 9:00 a.m.

**E N T E R :**

*Nan R. Nolan*

**Nan R. Nolan**
**United States Magistrate Judge**

**Dated: August 8, 2008**